

AO 106 (REV. 4/10) Affidavit for Search Warrant

AUSA Alexandra Morgan,

**FILED**
4/26/2022
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

### UNDER SEAL

In the Matter of the Search of:

Jarrett Snowden, Antoine Larry, and ▮▮▮▮▮▮▮▮,
as described in Attachments A1, C1, and E1, and for
the three cellular telephones, as described in
Attachments A2, C2, and E2

Case No.  22 M 321

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Jody Blau, a Special Agent of the Federal Bureau of Investigation, request a search warrant and state under penalty of perjury that I have reason to believe that on the following persons, property, or, premises:

### See Attachments A1, A2, C1, C2, E1, and E2

located in the Northern District of Illinois, there is now concealed:

### See Attachments B1, B2, D1, D2, F1, and F2

The basis for the search under Fed. R. Crim. P. 41(c) is evidence and instrumentalities.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 371, 666(a)(1)(B), and 1951(a) | conspiracy, bribery concerning programs receiving federal funds, and extortion |

The application is based on these facts:

### See Attached Affidavit,

Continued on the attached sheet.

s/ Jody Blau (with permission BWJ)
*Applicant's Signature*

JODY BLAU, Special Agent
Federal Bureau of Investigation
*Printed name and title*

Pursuant to Fed. R. Crim. P. 4.1, this Application is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the statements in the Application and Affidavit by telephone.

Date: April 26, 2022

*Judge's signature*

City and State: Chicago, Illinois

BETH W. JANTZ, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

### AFFIDAVIT

I, JODY BLAU, being duly sworn, state as follows:

## I. Introduction

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since approximately 2008. My current responsibilities include the investigation of public corruption offenses, including police corruption. Through my training and experience, I have become familiar with several investigative techniques used to investigate police corruption, including the use of confidential sources, consensual recordings, and physical surveillance.

2. This affidavit is made in support of an application for warrants to search:

- A Samsung Galaxy Note 9, assigned IMEI number 358959099339769 and telephone number (708) 527-5320 ("**Subject Phone 1**,") used by Jarrett Snowden;[1]

---

[1] Snowden was identified as the user of **Subject Phone 1** as follows: (a) according to subscriber information, **Subject Phone 1** is registered to ▮▮▮▮▮▮▮▮. Based on public records ▮▮▮▮▮ and Jarrett Snowden are relatives, and based on their respective ages, it is believed that ▮▮▮▮▮▮▮ is Jarrett Snowden's father (▮▮▮ was born in ▮▮▮ and Jarrett was born in 1988); (b) public records reflect that Jarrett Snowden has a vehicle registered in his name at the same address reflected in the subscriber records for **Subject Phone 1**; (c) based on Cook County court records and Phoenix, Illinois police department records, on November 5, 2021, Jarrett Snowden, who is a Phoenix police department officer, arrested CS-1. As explained in detail below, between November 12 and 14, 2021, CS-1 recorded several telephone conversations with the user of **Subject Phone 1**.

- A Samsung Galaxy S8, assigned IMEI number 354023081560751 and telephone number (708) 552-7682 ("**Subject Phone 2**"), used by Antoine Larry;[2]

- An iPhone 11 Pro Max A2161assigned ESN/MSN number 352849115604732 and telephone number (708) 574-6862 ("**Subject Phone 3**"), used by ▮▮▮▮▮▮▮▮▮;[3]

for evidence described further in Attachments B2, D2, and F2, concerning conspiracy, bribery concerning programs receiving federal funds, and extortion, in violation of Title 18, United States Code, Sections 371, 666(a)(1)(B), and 1951(a) (the "**Subject Offenses**"); and (2) warrants to search the persons of Snowden, Larry, and ▮▮▮▮▮▮ for purposes of seizing **Subject Phones 1**, **2**, and **3**, respectively, which were used as instrumentalities of the **Subject Offenses**.

3.    This affidavit is based on my own observations, information provided by other law enforcement agents, information provided by three confidential sources (CS-1, CS-2, and CS-3, each qualified below), my review of information derived from

---

During these calls, the user of **Subject Phone 1** made statements indicating that he was a Phoenix police officer who participated in CS-1's arrest; and (d) according to CS-1, Jarrett Snowden is the user of **Subject Phone 1.**

[2] Larry was identified as the user of **Subject Phone 2** as follows: (1) according to subscriber records, Larry is the registered subscriber of **Subject Phone 2**; and (2) according to CS-1, Larry is the user of **Subject Phone 2**.

[3] ▮▮▮▮▮ was identified as the user of **Subject Phone 3** as follows: (1) according to subscriber records, ▮▮▮▮▮ the registered subscriber of **Subject Phone 3**; (2) as explained below, toll records show that **Subject Phone 3** was in frequent contact with **Subject Phone 2** (Larry) on November 12, 2021, during a period when, based on the investigation, Larry and ▮▮▮▮ were communicating by telephone to coordinate ▮▮▮▮▮ collection of a bribe payment from CS-1 on Larry's and Snowden's behalf.

consensually recorded conversations, my review of records and reports, my training and experience as an FBI Special Agent, and the training and experience of other law enforcement agents with whom I have spoken. Because this affidavit is submitted for the limited purpose of securing search warrants for the **Subject Phones** and the persons of Snowden, Larry, and ▇▇▇▇▇▇, I have not included each and every fact that I know about the investigation. I have set forth facts that I believe are sufficient to establish probable cause for the requested search warrants.

## II.    Summary of Probable Cause

4.      On November 5, 2021, Village of Phoenix police officers Jarrett Snowden and Antoine Larry arrested CS-1 during a traffic stop around 151st Street and Halsted Street in Phoenix, Illinois. During the traffic stop, CS-1 swallowed crack cocaine that s/he was carrying on his/her person to conceal it from the officers. CS-1 was arrested and his/her vehicle was searched. A loaded firearm was recovered inside the trunk. The police seized and impounded CS-1's vehicle. CS-1 was transported to a hospital to be treated for ingestion of cocaine.

5.      At the hospital, Larry told CS-1 in substance that Larry and Snowden would see to it that CS-1 would not have to face criminal charges in connection with the traffic stop if CS-1 agreed to pay Snowden and Larry a total of $6,000. CS-1 agreed.

6.      After CS-1 was released from the hospital, CS-1 and Larry spoke by phone and CS-1 agreed to make a payment on or about November 12, 2021. Larry sent ▇▇▇▇▇▇▇▇▇ to CS-1's home to collect the payment. CS-1 had his/her cousin,

3

CS-2, deliver a cash payment of approximately $1,900 to ███. Shortly thereafter, Larry and Snowden informed CS-1 and CS-2 that the payment was not enough money. Snowden also told CS-1 in substance that CS-1 would have to pay thousands of dollars more to Snowden and Larry in exchange for certain criminal charges against CS-1 in connection the November 5, 2021 traffic stop not being filed and CS-1's car being released from police impoundment.

7.      Between November 12 and 14, 2021, CS-1 consensually recorded several phone calls with Snowden, using **Subject Phone 1**, in which Snowden demanded that CS-1 pay "ten tacos," which was code for $10,000. The recorded conversations, together with toll records and other evidence, establish that Snowden, Larry, and ███ used **Subject Phones 1**, **2**, and **3** to coordinate their efforts to illegally obtain money from CS-1 in furtherance of the **Subject Offenses**.

III.    **Facts Establishing Probable Cause**

        A. Background Information

8.      The Village of Phoenix is a municipality located in the south suburbs of Chicago. According to USASpending.gov, an official open data source on federal spending operated by the United States Department of Treasury, as well as grant records from the Federal Emergency Management Agency, Village of Phoenix was awarded federal benefits as part of a grant program that provides financial assistance to local fire departments, and federal grant funds in the amount of approximately $36,190.48 were disbursed to the Village of Phoenix on or about December 6, 2021.

9.      Based on my review of Cook County Court documents, Illinois

Department of Employment Security (IDES) records, Phoenix Police Department records, and information provided by CS-1 and CS-2, I know that Jarrett Snowden is a 33-year-old African American male who is employed as a police officer with the Phoenix Police Department. Snowden's current position is Sergeant, and his star number is 17.

10.     Based on IDES records and information provided by CS-1 and CS-2, I know that Antoine Larry is a 45-year-old African American male who is currently employed as a police officer with the Phoenix Police Department.

11.     Based on my review of National Criminal Information Center and Illinois Secretary of State records, I know that ███████████ is a 31-year-old African American male who resides in South Holland, Illinois.

B. <u>Confidential Source Information</u>

1. *CS-1 Information*

12.     On or about November 13, 2021, law enforcement interviewed CS-1 telephonically after receiving permission to do so from CS-1's attorney.[4] Before the interview, CS-1 was informed that the government would not use any information that s/he provided to the FBI in connection with this investigation against CS-1, including not sharing any of CS-1's statements with Cook County authorities

---

[4] CS-1's was identified as the individual interviewed telephonically on or about November 13, 2021 as follows: (1) CS-1's attorney provided law enforcement with CS-1's telephone number; (2) law enforcement called the number and CS-1 self-identified as the individual who answered the phone. (3) I later met with CS-1 several times in person. During the first such in-person meeting, CS-1 provided me with photographic identification. At each in-person meeting, I recognized the voice of CS-1 to be the same voice of the individual I interviewed by phone on November 13, 2021.

prosecuting the case against CS-1 arising from the November 5, 2021 traffic stop and arrest. As detailed below, CS-1 later admitted to law enforcement that some of the information provided during this interview was incomplete or untrue.

13.     During the November 13th phone interview, CS-1 stated the s/he made a living through construction work and owning a car business. CS-1 further advised that two Phoenix police officers had pulled him over in a traffic stop in the Phoenix area on November 5, 2021. CS-1 said the two officers identified themselves as "Officer Snowden" and "Officer Larry". CS-1 said that, at the time of the traffic stop, he/she had approximately one ounce of crack cocaine and approximately $2,700 in cash inside of his/her vehicle. CS-1 said the police purportedly found a loaded firearm in the trunk of CS-1's vehicle during the traffic stop, but that the firearm did not belong to CS-1 and that the police officers had planted the gun.

14.     CS-1 also said that, beginning shortly after he had been pulled over and continuing over a period of the next several days in November 2021, "Officer Snowden" and "Officer Larry" demanded money from CS-1, telling CS-1 that criminal charges against CS-1 in connection with the traffic stop would be dropped or not filed if CS-1 agreed to pay money to the two police officers. The details that CS-1 provided during the November 13th phone interview as well as subsequent interviews about the demands made by the two police officers and CS-1's responses to these demands are set forth in greater detail below in Paragraphs 19-37.

15.     On or about January 3, 2022, I conducted another telephone interview of CS-1. During the interview, CS-1 stated that s/he intended to sell the ounce of crack

cocaine that was recovered from him/her during the November 5, 2021, traffic stop. CS-1 further explained that s/he had been selling drugs, including marijuana and cocaine, for approximately 6-7 years—a fact that CS-1 had withheld during the telephone interview on November 13, 2021.

16.     On or about January 26, 2022, law enforcement FBI agents, including myself, and two AUSAs interviewed CS-1 in person. At the beginning of the interview, CS-1 was issued a proffer letter stating that the government would not make direct use of any information provided by CS-1 concerning the investigation. During this interview, CS-1 admitted that he did, in fact, have a loaded firearm in the trunk of his vehicle at the time of the November 5th traffic stop, and that he had lied during the November 13th phone interview about possessing the firearm because he feared getting in trouble for the firearm. CS-1 further admitted he had a total of approximately four ounces of crack cocaine during the traffic stop, and that he had lied during the November 13th and January 3rd phone interviews about only having one ounce of crack cocaine. CS-1 also admitted attempting to swallow some of the crack cocaine in a struggle with the police officers after the traffic stop – a fact that s/he had not disclosed during the prior phone interviews. CS-1 stated that, for the past several years, s/he has earned a living not only through construction work and owning a car business, but also by selling narcotics, including cocaine and marijuana. CS-1 told law enforcement that s/he intended to sell the crack cocaine that was seized during the November 5, 2021 traffic stop. CS-1 has multiple felony convictions, the most recent of which was in December 2021 (stemming from a May 2021 arrest).

17.     Although CS-1 intentionally furnished some false information during the November 13th and January 3rd phone interviews, the information summarized in Paragraphs 18-36 below that CS-1 provided about the demands for money made by Snowden and Larry, and CS-1's responses to these demands, have been corroborated in significant respects by independent evidence detailed in this Affidavit, including consensually recorded conversations, toll records, police and court records, hospital records, and information provided by two other confidential sources, CS-2 and CS-3. Therefore, I assess that the information provided by CS-1 set forth in Paragraphs 18-36 is credible and reliable.

18.     CS-1 provided the following information in summary during the November 13th phone interview and subsequent telephone and in-person interviews, including the January 26, 2022 interview: On or about November 5, 2021, at approximately 9:00 a.m., two Phoenix police officers conducted a traffic stop of CS-1 near 145th Avenue on the border of Phoenix and Harvey, Illinois. CS-1 was driving a white Chrysler 300 C sedan. The two officers who conducted the stop identified themselves as "Officer Snowden" and "Officer Larry."[5] Snowden was driving a marked Village of Phoenix police car and Larry was driving an unmarked vehicle. Both officers were dressed in what appeared to be standard police uniforms. CS-1 was

[5] As explained below, CS-1 has correctly identified unmarked photographs of Snowden and Larry. Further, toll records corroborate that CS-1 had frequent contact with both individuals between approximately November 11 and November 14. When I initially interviewed CS-1, CS-1 believed Antoine Larry's name was "Larry Bell." However, as explained below, CS-1, CS-2, and CS-3 have each separately identified unmarked photographs of Antoine Larry as the second officer, and toll records corroborate these identifications.

8

arrested and his/her vehicle was searched. A loaded firearm was recovered inside the trunk. The police seized and impounded CS-1's vehicle. CS-1 was transported to a hospital to be treated for ingestion of cocaine.

19.     According to CS-1, at the time of the stop, CS-1 possessed approximately an ounce of crack cocaine on his person and had approximately three ounces of crack cocaine, two ½ ounce baggies of marijuana, and a scale, located in the backseat area of his/her vehicle. CS-1 intended to sell the crack cocaine. According to CS-1, s/he has sold crack cocaine and marijuana in the Chicagoland area for multiple years and those illegal narcotics sales are one of CS-1's main sources of income.

20.     As noted above, CS-1 had a loaded Glock firearm in the trunks of his/her vehicle. CS-1 also had approximately $1,700 in cash on his person and approximately $2,000 in cash inside an envelope that was tucked between the driver's seat and center console of his/her vehicle car.[6] CS-1 clarified during the January 26, 2022 interview that he had a total of $3,700 on his/her person and in the vehicle during the traffic stop—and not the $2,700 amount that s/he had mentioned during the November 13th phone interview.

21.     According to CS-1, during the stop, CS-1 attempted to flee from Snowden and Larry and a struggle ensued which lasted several minutes. During the struggle, CS-1 attempted—and managed to—swallow some the crack cocaine that CS-1 was

---

[6] CS-1 explained that some of this cash represented money s/she had withdrawn from a bank account which s/he held at Fifth Third Bank, money received from the sale of drugs, and money from pawning jewelry. As explained below at paragraph 84, this information is corroborated in part by financial records.

carrying on his person. Ultimately, Snowden and Larry were able to subdue and handcuff CS-1. During the struggle and arrest, Larry stated words to the effect of, "there's no need for all of this" and "we're willing to work something out." An ambulance was called because the police officers saw that CS-1 had swallowed or attempted to swallow some of the drugs.

22.     According to CS-1, around the time s/he was handcuffed, several other officers arrived on scene. The officers searched CS-1's vehicle. Snowden recovered the loaded Glock firearm in the trunk. CS-1 did not recall which officers recovered the crack cocaine and paraphernalia in the backseat area, but believed the items were recovered.

23.     According to CS-1, around the time of the vehicle search, an ambulance arrived on scene to take CS-1 to the hospital. The ambulance transported CS-1 to Ingalls Memorial Hospital, and Larry accompanied CS-1 on the ride. After arriving at the hospital but before being admitted, Larry waited with CS-1 in the emergency room area. During this time, Larry repeated statements to the effect of, "we could have just worked something out."[7] Larry further explained to CS-1 in substance that s/he could give Larry and Snowden money and they would see to it that CS-1 was not charged in connection with the traffic stop. CS-1 asked Larry in substance if Larry and Snowden would accept $3,000 to $4,000 apiece in exchange for CS-1 not being

_____

[7] As explained below at Paragraph 74, hospital records show that CS-1 was admitted to Ingalls Memorial Hospital on November 5, 2021 in police custody, treated for ingestion of cocaine, and discharged on November 7, 2021. Hospital records further reflect that during an emergency room triage examination of CS-1 that occurred on November 5 at approximately 10:33 a.m., "Officer Larry" was at CS-1's bedside.

charged in connection with the traffic stop. Larry agreed to that arrangement. Larry told CS-1 that, while on police duty, Larry regularly stationed himself at a Citgo gas station located on Halsted Street in Phoenix.[8] Larry further stated that, after CS-1 was released from the hospital, CS-1 should meet Larry at the gas station to deliver the money.

24.     According to CS-1, during his/her conversation with Larry at the hospital, CS-1 told Larry that Larry and Snowden should take the $3,700 that CS-1 had in his/her vehicle at the time of the arrest as a partial payment of the full $6,000. According to CS-1, Larry appeared to pretend that no money had been seized during the traffic stop. CS-1's understanding was that once s/he got out of the hospital, s/he would only be required to pay Larry and Snowden an additional approximately $2,300: $6,000 minus the approximately $3,700 that CS-1 believed had been seized during the traffic stop. According to CS-1, while CS-1 and Larry were at the hospital, Larry also appeared to pretend that no drugs had been seized from CS-1 and CS-1's vehicle during the traffic stop.[9]

25.     According to CS-1, while still at the emergency room, Larry told CS-1 that he wanted to help CS-1 because of CS-1's race and gender, and that he would not help CS-1 if s/he were a different race. According to CS-1, Larry further stated that he and Snowden had "helped" three or four other individuals on prior occasions. CS-

---

[8] Based on an open-source internet search, there is a Citgo gas station located at 15221 Halsted Street in Phoenix.

[9] The police reports associated with CS-1's traffic stop do not mention any crack cocaine or money being seized.

1 understood this to mean Larry and Snowden had taken cash payments from other arrestees in exchange for dropping charges against those individuals. According to CS-1, Larry warned CS-1 not to report Larry or Snowden to law enforcement. Larry stated that others had tried to report Larry in the past, but that Larry was still a police officer and on the job.

26.     According to CS-1, s/he was released from the hospital a few days after the traffic stop, and then transferred in custody to the Village of Phoenix police station. At the police station, Snowden processed CS-1.[10] During the processing, Snowden stated words to the effect of, "Just do everything Officer Larry told you and you'll be fine." Snowden returned the cellphone that had confiscated from CS-1 at the time of his/her arrest, and told CS-1 that s/he was going to court. CS-1 later appeared before a judge and was released on electronic home monitoring.[11]

27.     According to CS-1, after s/he was ordered released, CS-1 sent his/her cousin, CS-2, and CS-1's friend, CS-3, to the Phoenix police station to pick up the personal property confiscated from CS-1 at the time of his/her arrest. According to CS-1, CS-2 and CS-3 returned with most of CS-1's personal items, but none of the approximately $3,700 that CS-1 had on his/her person and in his/her vehicle at the time of the traffic stop and arrest. According to CS-1, CS-2 and CS-3 told CS-1 that

---

[10] Cook County records reflect that CS-1 was processed for his arrest on November 7, 2021, but do not list the processing officer.

[11] As explained below at Paragraphs 75-77, this is corroborated by Cook County Court records, which show that on November 8, 2021, CS-1 was charged in a criminal complaint with unlawful possession of a firearm and being an armed habitual criminal. The court records further reflect that CS-1's initial appearance was held on November 8, 2021, at which CS-1 was ordered released on a $50,000 bond secured by $5,000 and electronic monitoring.

no money was included among the property that was released at the police station.[12] According to CS-1, s/he believed that Snowden and Larry had taken the money and that, therefore, CS-1 only owed Larry and Snowden an additional approximately $2,300. As explained in further detail at paragraphs 80 and 81 below, I have reviewed all police reports and other documentation associated with CS-1's November 5, 2021 traffic stop and arrest that CS-1's defense counsel has received in discovery in CS-1's associated prosecution. There is no indication from the reports that the police seized or inventoried any cocaine (crack or powder) or money from the traffic stop.

28.     According to CS-1, a few days after CS-1 returned home (which based on Cook County court records was on or about November 8, 2021), CS-1 received several phone calls from Larry.[13] During the calls, CS-1 and Larry discussed meeting so that CS-1 could pay money owed to Larry and Snowden. During the calls, Larry also told CS-1 in substance that Larry and Snowden could deliberately not show up for CS-1's court hearings to get the charges against CS-1 dismissed. Larry told CS-1 that CS-1 still owed Larry and Snowden "two tacos," which CS-1 understood as code for $2,000.[14] Based on CS-1's conversations with Larry, CS-1's understood that, once CS-1 had paid the $2,000, Larry would cause all charges arising from the November

---

[12] As explained below at paragraph 48, CS-3 confirms that s/he retrieved CS-1's property from the Phoenix Police Department after CS-1 was released from the hospital/police custody. CS-3 has told agents that there was no money included among CS-1's returned property.

[13] As explained below at paragraph 53, toll records show that CS-1 had approximately 7 contacts with **Subject Phone 2** (Larry) between November 11, 2021 and November 12, 2021; all of the contacts originated from **Subject Phone 2** (Larry).

[14] As discussed below, during consensually recorded phone calls between Snowden, who was using **Subject Phone 1**, and CS-1 between November 12 and 14, 2021, Snowden repeatedly referred to the extortion payment amounts as "tacos."

5, 2021 traffic stop to be dropped, and CS-1's vehicle to be released from impoundment.

29.     According to CS-1, during the first few days after his/her release from the hospital, CS-1 was able to gather approximately $1,900 from his own funds and by borrowing money. Specifically, according to CS-1, approximately half of the $1,900 came from his/her own funds, and approximately half came from money that CS-1 borrowed from his/her grandmother.[15] On or about November 9 or 10, 2021, CS-1 (who again was on house arrest) gave the $1,900 to CS-3 at CS-1's home and asked CS-3 to deliver the money to Larry at the Citgo gas station in Phoenix.[16] CS-3 agreed to make the delivery, but, according to CS-1, CS-3 later returned to CS-1's home with the money and stated that Larry had not been at the gas station.

30.     According to CS-1, after this attempted delivery to Larry, Larry and CS-1 arranged over telephone for CS-1 to make a payment to Larry at CS-1's home on or about November 12, 2021. However, on the day of the planned payment, Larry called CS-1 and stated that Larry was sending a third party to pick up the payment from CS-1 at CS-1's home.

31.     Shortly after this phone call, CS-1 observed a black male wearing a

---

[15] On or about April 7, 2022, I asked CS-1 to provide me with his/her grandmother's contact information. CS-1 provided me with a telephone that I immediately called. A woman who sounded to be elderly answered and confirmed that she was CS-1's grandmother. The woman with whom I spoke further confirmed that in or around November 2021, shortly after CS-1 got out of jail, she loaned CS-1 approximately $1,000.

[16] As explained below at Paragraph 49, CS-3 confirms that, at CS-1's direction, s/he attempted to deliver approximately $2,000 to Larry at the Citgo gas station in Phoenix a few days after CS-1 was released from the hospital.

hooded shirt, who was later identified as ███████████ (see below at Paragraph 38, Footnote 23) drive up to the front of CS-1's home in a blue or purple two-door sedan. CS-2 was at CS-1's home at this time. CS-1 was standing at his/her window with the blinds open and was not wearing a shirt. Larry telephoned CS-1 and told him/her to put a shirt on because CS-1 was making Larry's "guy" nervous. Because CS-1 was on house arrest and could not go outside, he/she gave approximately $1,900 in cash to CS-2 to deliver to ████. The money was in denominations of 20s, 50s, and 100s and was wrapped in a rubber band. CS-1 stood at his/her window and watched CS-2 leave CS-1's the residence and get inside the blue/purple vehicle. CS-1 saw CS-2 lift his/her shirt up for ████ inside the vehicle (according to CS-1, it appeared that CS-2 was showing ██████ that CS-2 was not wearing a wire), and then CS-1 saw CS-2 hand the money to ██████. CS-2 then left the vehicle and returned to CS-1's residence and ██████ drove off. CS-1's best recollection is this cash delivery took place sometime between 10:00 a.m. and 1:00 p.m. on November 12, 2021.

32.     According to CS-1, shortly after CS-2 made the delivery, Larry called CS-1 and stated the payment "wasn't right." Larry asked CS-1 why s/he had not paid the full $6,000 that they had agreed to at the hospital. Larry sounded upset and ultimately hung up on CS-1. CS-1 believes this was the last time s/he spoke to Larry.

33.     Around the time of this call, CS-1 asked CS-2 to go to the Phoenix police station to try to *recover* CS-1's vehicle that had been impounded. CS-2 agreed to do so. Later the same day, CS-2 returned to CS-1's home and told CS-1 that CS-2 run into Larry and Snowden at the police station, and that the officers were upset about

15

the payment made outside of CS-1's house. CS-2 further stated that Larry and Snowden were demanding more money and had threatened to make things difficult on CS-1 and CS-2 if CS-1 did not pay more money to them, including by taking the vehicles of both CS-1 and CS-2.[17]

34.    According to CS-1, shortly after CS-2's encounter with Snowden and Larry at the police station, CS-1 began receiving calls from Snowden who, according to CS-1, had not called CS-1 previously. During these calls, Snowden told CS-1 in substance that CS-1 needed to pay Snowden and Larry a total of "10 tacos," which CS-1 understood to mean $10,000. At that point, CS-1 decided to begin recording his/her calls with Snowden.[18] CS-1 was considering reporting Snowden and Larry to the law enforcement authorities and wanted to have recorded evidence in support. CS-1 recorded calls with Snowden by placing the call on speakerphone and activating a recording application on a second phone owned by CS-1 (an iPhone).[19]

35.    According to CS-1, CS-3 was present for some of CS-1's recorded calls with Snowden, and CS-3 made his/her own recordings of these same calls using CS-

---

[17] As explained below at Section III.B.2, CS-2 corroborates this information.

[18] CS-1 explained that he had not recorded any of his earlier calls with Larry because, at the time of those calls, CS-1 intended to go along and make the payments to the police officers and not tell anyone.

[19] As explained below, CS-1 has provided recordings of phone calls with Snowden to the FBI. Based on my review of the recordings and a comparison of the time and date stamp on the recordings to CS-1's toll records, the recordings appear to be authentic recordings between CS-1 and Snowden which occurred on November 12 and 13, 2021. I have also examined the phone that CS-1 used to make the recordings. Based on this examination as well as my training and experience, it was possible for CS-1 to make real-time recordings of the calls in the manner CS-1 described.

3's own phone.[20]

36.     According to CS-1, on or about November 13, 2021, CS-1 decided to reach out to his/her attorney to report Snowden and Larry's conduct. CS-1's attorney in turn contacted federal law enforcement.

### 2.   CS-2 Information

37.     The FBI conducted multiple interviews with CS-2, the first of which was on or about November 18, 2021.[21] During the interviews, CS-2 provided the following information in summary: CS-2 is CS-1's cousin. On or about November 11 or 12, 2021, CS-2 was at CS-1's residence when CS-1 received a telephone call from Phoenix police officer Antoine Larry, which CS-2 put on speakerphone.[22] Prior to the time of this call, CS-1 had told CS-2 that the police officers involved in CS-1's arrest on November 5, 2021 were seeking cash from CS-1 in exchange for dropping charges against CS-1. According to CS-2, CS-2 heard Officer Larry tell CS-1 over the speakerphone to meet outside of CS-1's house. Because CS-1 was on house arrest, CS-1 gave CS-2 a bundle

---

[20] This is corroborated by CS-3. *See* Paragraph 50.

[21] CS-2 has no known felony convictions. The government has not made any promises or provided any type of benefit to CS-2 in exchange for his/her cooperation. I assess that the information provided by CS-2 to be credible, as it is corroborated in significant respects by independent evidence, including consensually recorded recordings, toll records, court records, and information provided by CS-1 and CS-3.

[22] CS-2 has identified unmarked photographs of Larry and Snowden as the two Phoenix police officers with whom he interacted on or about November 11 or 12, 2021, while CS-2 was attempting to retrieve CS-1's vehicle from impound. As with CS-1, CS-2 initially believed Antoine Larry's name was "Larry Bell." CS-2 believed s/he heard that name from CS-1.

According to CS-2, s/he was able to identify Larry as the speaker in the calls on November 11 or 12, 2021 because CS-1 put the calls on speakerphone, Larry has a distinctive voice, and CS-2 later met with Larry in person and recognized the voice to be the speaker on the November 11 or 12, phone calls with CS-1.

of cash tied with a rubber band to deliver the money to Larry. CS-2 agreed to deliver the money. CS-2 did not count the money. To the best of CS-2's recollection, the delivery took place sometime between 10:00 a.m. and 12:00 p.m. on or about November 11 or 12, 2021.

38. According to CS-2, when s/he got outside, s/he saw an unknown black male, who CS-2 later identified from a photograph as █████, sitting in the driver's seat of a blue or purple car.[23] CS-2 got in the front driver's seat of the car. ███ handed CS-2 a cell phone and Larry was on the line.[24] Larry directed CS-2 to turn off his/her cellphone and place it on the dashboard, which CS-2 did. Larry then directed CS-2 to lift his/her shirt so that ███ could make sure that CS-2 was not wearing a wire. CS-2 complied. Next, Larry directed CS-2 to give the money to ███, which CS-2 did. Larry asked ███ if the money was good, and ███ said that it was -- though ███ did not count the money in CS-2's presence.

39. According to CS-2, Larry then stated that all charges against CS-1 would be dropped and Larry would not show up in court to testify against CS-1. Larry further stated he would provide CS-1 with Larry's Zoom court identification number so CS-1 could log in to the court's remote hearing system and confirm that Larry did not appear to testify against CS-1. Larry further stated that he was writing up the

[23] On or about February 7, 2022, I showed CS-2 an unmarked photograph of ███ and CS-2 identified ███ as the individual in the blue/purple vehicle to whom CS-2 delivered the money on or about November 11 or 12, 2021. As explained below at paragraph 56, toll records corroborate CS-2's identification of ███.

[24] According to CS-2, s/he was able to identify Larry as the speaker in this call for the same reasons set forth in Footnote 22.

release for CS-1's car from police impoundment, and that the vehicle would be available for pickup later that day. CS-2 then left the vehicle, returned to CS-1's residence, and relayed to CS-1 what Larry had said.[25]

40.     According to CS-2, shortly after CS-2 returned to CS-1's residence, CS-1 received a phone call from Larry, which CS-1 placed on speakerphone. Larry repeatedly stated words to the effect of, "this ain't right," and then hung up the phone.

41.     According to CS-2, after this call, CS-1 asked CS-2 to go to the Phoenix police station to retrieve CS-1's vehicle from impoundment. CS-2 traveled to the Phoenix police station and spoke to a receptionist there about getting the release paperwork for CS-1's vehicle. After a few minutes, Larry entered the police station. Larry told CS-2 that CS-2 would have to speak to Larry's superior before CS-1's car could be released. Larry then motioned to CS-2 that Larry wanted to speak to CS-2 outside.

42.     According to CS-2, CS-2 followed Larry outside to the front of the police station. Once outside, Larry stated words to the effect of, "This ain't right, I don't play with my motherfucking money." CS-2 pretended like s/he did not know what was going on and stated that s/he was just there to retrieve CS-1's vehicle. Around this time, Snowden pulled up to the police station in a police vehicle. Snowden got out of the vehicle and approached Larry and CS-2. Snowden stated words to the effect of, "You think we are motherfucking playing? It was not enough money. We are not

---

[25] According to CS-2, CS-2 believed Larry thought he was speaking to CS-1 during the phone call in the car. CS-2 did not tell Larry that s/he was not CS-1.

playing; we are holding up our end and you're not holding up yours."

43.     According to CS-2, Larry then told Snowden that CS-2 was not CS-1 and CS-2 did not know what was going on. Snowden then stated words to the effect of, "[CS-1] got you and everyone else in a lot of trouble, I don't play around with my money." Snowden told CS-2 to tell CS-1 that it was "five tacos" now. CS-2 asked if Snowden meant $500. Snowden stated something to the effect of, "I'm not talking about $5 or $500, it's $5000 – [CS-1] know what the fuck it is." Snowden then told CS-2 that Snowden had seen CS-2 at the police station the previous day. [CS-2 explained that s/he had traveled to the Phoenix police department the previous day with CS-3 to pick up CS-1's personal belongings, which is corroborated by CS-1 and CS-3]. Snowden then asked CS-2 to pull down the COVID facemask he was wearing. CS-2 did so. Snowden stared at CS-2 for several seconds, and then stated words to the effect of, "I'm not fucking playing, this is going to be hard on everyone." Snowden then threatened to take CS-2's vehicle if CS-1 did not pay the officers. Snowden asked CS-2 if CS-2's phone was off, and CS-2 stated that it was. Snowden and Larry then received a police dispatch about an individual being jumped and they both left. CS-2 returned to CS-1's residence without getting CS-1's vehicle out of impoundment.

        3.      *CS-3 Information*

44.     The FBI has conducted approximately two interviews with CS-3, the first of which was on or about February 1, 2022.[26] During the interview, CS-3

_____

[26] CS-3 has no known felony convictions. The government has not made any promises or provided any type of benefit to CS-3 in exchange for his/her cooperation. I deem the information provided by CS-3 to be credible, as it is corroborated in significant respects by

correctly identified an unmarked photograph of Antoine Larry as "Officer Larry," and an unmarked photograph of Jarrett Snowden as "Officer Snowden."

45.    CS-3 provided the following information in summary: CS-3 is a close friend of CS-1. After CS-1 was arrested and charged in early November 2021, CS-3 provided CS-1 with $5,000 to post bond[27]. Shortly after CS-1 was released from jail in November 2021, CS-1 told CS-3 that the two officers who had arrested him were trying to obtain cash from CS-1 in exchange for dropping the charges against CS-1 related to the arrest. Around this same time, CS-1, who was on house arrest, asked CS-3 and CS-2 to go to the Phoenix police station to pick up CS-1's personal property that had been confiscated when CS-1 was arrested. CS-3 agreed to do so, and CS-3 and CS-2 drove to the Phoenix police station in CS-2's car (CS-2 drove).

46.    On the way to the police department, CS-3 called the Phoenix police department to notify them that CS-3 and CS-2 were coming in to retrieve CS-1's property. CS-3 spoke to a male officer who identified himself as Officer Larry. Larry told CS-3 that Larry needed CS-1's approval to release CS-1's property to CS-3. CS-3 then initiated a 3-way phone call between CS-3, CS-1, and Larry during which CS-1 gave consent for Larry to release CS-1's property to CS-3.

47.    According to CS-3, a black male officer, who CS-3 identified as Larry,

---

independent evidence, including consensual recordings, toll records, court records, and information provided by CS-1 and CS-2.

[27] CS-1 has confirmed that CS-3 posted $5,000 in bond for CS-1. As explained below at Paragraph 77, Cook County Court records reflect that on or about November 8, 2021, CS-1 was released on electronic home monitoring and a $50,000 bond secured by $5,000.

was standing outside the police department when CS-2 and CS-3 pulled up.[28] CS-3 exited the vehicle to speak to Larry. Larry asked CS-3 something to the effect of, "[CS-1's first name] didn't tell you what's going on?" CS-3 told Larry that CS-3 did not know what Larry was talking about. Larry replied with words to the effect of, "I hope not." Larry then asked for and took a picture of CS-3's driver's license. Larry also wrote down the license plate number of CS-2's car. CS-3 and Larry then went inside the police station to retrieve CS-1's belongings. CS-2 remained in the car.[29] Once inside, Larry went into a restricted office area while CS-3 remained in the lobby. While waiting for CS-1's belongings, CS-3 saw through a glass window in the lobby Larry talking to another black male officer, who CS-3 identified as Snowden.[30] Moments later, Larry returned to the lobby and handed CS-3 a clear plastic bag containing jewelry, a belt, and other personal items. The bag did not contain any cash. According to CS-3, CS-3 and CS-2 then left the police station and traveled to CS-1's residence to deliver CS-1's property to him/her.

48.     According to CS-3, over the next several days, CS-3 went to the store several times to purchase items for CS-1 and then delivered the items to CS-1 at his/her residence. On several of these visits, CS-3 observed CS-1 receiving phone calls

---

[28] During the February 1, 2022 interview, I showed CS-3 an unmarked photograph of Antoine Larry, and CS-3 identified the individual depicted as the officer who was standing outside the police station when CS-3 and CS-2 arrived to retrieve CS-1's property.

[29] CS-2 has confirmed this.

[30] During the February 1, 2022 interview, I showed CS-3 an unmarked photograph of Snowden, and CS-3 identified the individual depicted as the officer with whom CS-3 observed Larry conversing behind the glass window.

from an unknown number. CS-1 told CS-3 it was Larry calling.

49.     According to CS-3, a few days after CS-3 retrieved CS-1's property from the police station, CS-1 asked CS-3 to deliver approximately $2,000 in cash to Larry. CS-1 explained that Larry regularly sat in his police vehicle at a Citgo gas station on Halsted Street in Phoenix while on duty, and asked CS-3 to deliver the money to Larry at the gas station. CS-1 gave CS-3 a bundle of cash wrapped in a rubber band and told CS-3 it was approximately $2,000. CS-3 took the cash and traveled to the Citgo gas station, but Larry was not there. CS-3 returned to CS-1's residence and returned the cash to CS-1.

50.     According to CS-3, a few days later, CS-3 was at CS-1's residence when an individual who CS-1 identified as Snowden called CS-1 at least two times. CS-1 put both calls on speakerphone and CS-3 recorded the calls on CS-3's phone. CS-3 believed that CS-1 recorded the calls on CS-1's phone as well. CS-3 played the recordings for me, and I confirmed that the conversations contained within the recordings were the same conversations that were captured in the recordings made by CS-1 and that the time stamps of the recordings were consistent with the recordings made by CS-1.

### C.  Corroborating Evidence

#### 1.  *Toll Records*

51.     On or about November 14, 2021, I met with CS-1 at his/her residence. During the meeting, CS-1 showed me the phone ("CS-1 Phone") on which s/he had received several recent phone calls from Snowden and Larry. Based on information

provided by CS-1 and my own examination of CS-1 Phone, I determined the phone number assigned to CS-1 Phone and issued a grand jury subpoena for toll records. I later obtained toll records for **Subject Phone 1** (Larry) and **Subject Phone 2** (Snowden)

52.     The toll records[31] revealed that between November 11, 2021, at approximately 12:07 p.m. and November 12, 2021, at approximately 2:29 p.m., CS-1 Phone received approximately seven incoming calls from **Subject Phone 2** (Larry). There were no outgoing calls from CS-1 Phone to **Subject Phone 2** (Larry) during this same period. Based on the toll records, I am able to see that, for every call that **Subject Phone 2** placed to CS-1, the user of **Subject Phone 2** dialed "*67" prior to dialing CS-1's phone number. Based on my training and experience, I know that *67 is a call feature that allows the caller to block the call recipient from seeing the caller's number (but does not prevent the callers number from being captured on toll records). There were no phone contacts between CS-1 Phone and **Subject Phone 2** (Larry) between November 1, 2021, and November 10, 2021, or between November 15 and November 23, 2021.

53.     The toll records further revealed that between November 12, 2021, at approximately 9:09 p.m. and November 14, 2021, at approximately 12:22 p.m., CS-1 Phone received approximately nine incoming calls from **Subject Phone 1** (Snowden). There were no outgoing calls from CS-1 Phone to **Subject Phone 1**

---

[31] The toll records I obtained for **Subject Phones 1** and **2** covered the period of November 24, 2020 through November 23, 2021. The toll records I obtained for **Subject Phone 3** covered the period of November 1, 2021 through November 16, 2021.

(Snowden) at any point during the entire period for which we received toll records for **Subject Phone 1** (November 24, 2020 through November 23, 2021). For every call that **Subject Phone 1** placed to CS-1, the user of **Subject Phone 1** dialed "*67" prior to dialing CS-1's phone number. There were no telephone contacts between CS-1 Phone and **Subject Phone 1** (Snowden) between at least November 1, 2021 and November 13, 2021, or between November 15, 2021 to at least November 23, 2021.

54.    The above toll records are consistent with CS-1's information. Specifically, the toll records corroborate CS-1's statement that, days after s/he was placed on electronic home monitoring on or about November 8, 2018, Larry began reaching out to CS-1 to obtain money. The records also corroborate CS-1's statements that, after the approximately $1,900 cash payment was made and Larry and Snowden were unhappy, Snowden began calling CS-1 demanding more money. The records further corroborate that CS-1 had never had telephone contact with Larry or Snowden outside of the approximately 10 day-period after CS-1's arrest.

55.    Toll records further reflect the following:

a.    **Subject Phones 1** (Snowden) and **2** (Larry) had phone contact on November 12, 2021 (the day on which, based on all of the evidence, I believe CS-2 made the $1,900 payment to ▮▮▮▮). Specifically, on that day, **Subject Phones 1** (Snowden) and **2** (Larry) had approximately 4 phone contacts, which occurred within an hour of Larry contacting ▮▮▮▮ and CS-1

b.    **Subject Phone 1** (Snowden) and **Subject Phone 2** (Larry) each had substantial contacts with **Subject Phone 3** (▮▮▮). Between approximately December 3, 2020 and August 13, 2021, **Subject Phones 1** (Snowden) and **3** (▮▮▮ had approximately 46 contacts, with only a single contact after August 13, 2021; which contact was on November 12, 2021. The toll records further reflect that the user of the **Subject Phone 1** (Larry) dialed "*67"

25

prior to dialing **Subject Phone 3**'s (⬛⬛⬛ number on the November 12, 2021 call, but did not dial **\*67** on any of the previous calls during the December 3, 2020 to August 13, 2021 time period.

c. **Subject Phone 2** (Larry) and **Subject Phone 3** (⬛⬛ were in frequent phone contact on November 12, 2021, with at least 9 contacts, the third highest contact day within the preceding year.

d. **Subject Phone 2**'s (Larry) call activity on November 12, 2021, is consistent with the user of **Subject Phone 2** (Larry) coordinating some type of action involving CS-1 and the users of **Subject Phones 1** (Snowden) and **3** ⬛⬛⬛) based upon the information provided by CS-1, CS-2, and CS-3, and the recorded conversations summarized below linking Snowden and Larry to efforts to obtain cash payments from CS-1. The pattern of activity was as follows:

- 9:58 a.m. **Subject Phone 2** (Larry) called **Subject Phone 1** (Snowden) - Duration 302 seconds;

- 10:20 a.m. **Subject Phone 2** (Larry) called **Subject Phone 1** (Snowden)**; the call was forwarded to voicemail** - Duration 4 seconds

- 10:31 a.m. **Subject Phone 2** (Larry) called **Subject Phone 1** (Snowden) - Duration 58 seconds

- 10:37 a.m. CS-1 called the Phoenix Police Department at 708-331-2193 – Duration 20 seconds.

- 10:44 a.m. **Subject Phone 2** (Larry) called **Subject Phone 1** - Duration 18 seconds

- 10:59 a.m. **Subject Phone 3** (⬛⬛⬛ called **Subject Phone 2** (Larry) - Duration 47 seconds

- 11:05 a.m. **Subject Phone 2** (Larry) called **Subject Phone 3** (⬛⬛ - Duration 33 seconds

- 11:21 a.m. **Subject Phone 2** (Larry) called CS-1 Phone using **\*67** to block the caller ID - Duration 42 seconds

- 11:21 a.m. **Subject Phone 3** ▓▓▓ called **Subject Phone 2** (Larry); the call was forwarded to voice mail – Duration 2 seconds.

- 11:26 a.m. **Subject Phone 2** (Larry) called **Subject Phone 3** (▓▓▓) Duration 214 seconds

- 11:56 a.m. **Subject Phone 2** (Larry) called CS-1 Phone using *67 to block the caller ID - Duration 24 seconds

- 12:16 p.m. **Subject Phone 2** (Larry) called **Subject Phone 3** (▓▓▓ - Duration 27 seconds

- 12:42 p.m. **Subject Phone 2** (Larry) called **Subject Phone 3** - Duration 328 seconds

- 12:48 p.m. **Subject Phone 2** (Larry) called CS-1 Phone using *67 to block the caller ID - Duration 8 seconds

- 12:56 p.m. **Subject Phone 3** (▓▓▓ called **Subject Phone 2** (Larry)- Duration 338 seconds

- 1:10 p.m. **Subject Phone 2** (Larry) called **Subject Phone 3** ▓▓▓ Duration 61 seconds

- 2:30 p.m. **Subject Phone 2** (Larry) called CS-1 Phone using *67 to block the caller ID - Duration 53 seconds

- 9:05 p.m. **Subject Phone 1** (Snowden) called **Subject Phone 3** (▓▓▓ using *67 to block the caller ID – Duration 0 seconds.

- 9:09 p.m. **Subject Phone 1** (Snowden) called CS-1 Phone using *67 to block the caller ID – Duration 250 seconds.

56. As reflected above, there was a particularly high-level of call activity between approximately 10:00 a.m. and 1:00 p.m.—the approximate timeframe in which CS-1 and CS-2 estimate the cash delivery was made to ▓▓▓

### 2. *The Snowden/CS-1 Consensually Recorded Phone Calls*

57.     On or about November 17, 2021, I extracted all data on CS-1 Phone using the FBI's standard cellphone data extraction software. Through the extraction, I recovered four video/audio files that CS-1 stated were recordings that s/he made of telephone calls with Snowden. Each file bore a time and date stamp that showed when the recording was made. The time and date stamp for each of the four recordings, as well as the recording lengths, were as follows:

- November 12, 2021 at 9:11 p.m. (140 seconds)

- November 13, 2021 at 1:03 p.m. (153 seconds)

- November 13, 2021 at 2:54 p.m. (119 seconds)

- November 13, 2021 at 5:22 p.m. (49 seconds)

58.     I reviewed each of the four recordings and determined that the speakers on each recording are CS-1 and the same male individual, who CS-1 has identified as Snowden. CS-1 explained to me that for each recording, CS-1 placed the call on speakerphone and then activated the video recording function on a second phone owned by CS-1. CS-1 explained that on a couple of the calls, s/he did not activate the video recording function until several seconds after s/he had answered the call, so in some of the recordings the beginning of the call was not recorded. CS-1's explanation was consistent with my review of the four recordings, two of which each appeared to begin mid-conversation (recorded call 1 and 4, see below).

59.     I then compared the time/date stamps of the CS-1 Phone recordings to the CS-1 Phone toll records. Each recording appeared to align with an incoming call

that CS-1 Phone received from Subject Phone 1 (Snowden). Specifically, the above 4 recordings matched up with the following toll records, in that: (1) the recordings' date/time stamps approximately align with the call time of the respective toll record; and (2) the duration of the recordings approximately align with the duration of the respective toll record after factoring in CS-1's explanation that, on a couple of the calls, s/he did not activate the recording function until after the phone call began. The matching toll records are, respectively, as follows:

1. A November 12, 2021, incoming phone call from **Subject Phone 1** (Snowden) to CS-1 Phone that began at approximately 9:09 p.m. and lasted approximately 250 seconds;

2. A November 13, 2021, incoming phone call from **Subject Phone 1** (Snowden) to CS-1 Phone that began at approximately 1:02 p.m. and lasted approximately 155 seconds;

3. A November 13, 2021, incoming phone call from **Subject Phone 1** (Snowden) to CS-1 Phone that began at approximately 2:53 p.m. and lasted approximately 121 seconds;

4. A November 13, 2021, incoming phone call from **Subject Phone 1** (Snowden) to CS-1 Phone that began at approximately 5:22 p.m. and lasted approximately 51 seconds.

**Recorded Call 1 (November 12, 2021, at approximately 9:09 p.m.)**

60. During the first recorded call, which, based on the recording timestamp/toll record analysis explained above, occurred on November 12, 2021, at approximately 9:09 p.m., the following exchange occurred[32]:

---

[32] This affidavit includes draft transcripts of consensually recorded conversations. The transcripts are based on a preliminary review of the recorded conversations and are not final transcripts. I have not included transcripts of the entirety of the recorded conversations. I

[Recording begins mid-conversation]:

CS-1:            No, he ain't, mother fucker, I mean we talked about it but we didn't talk about it that much though bro. It was like, it was like around six. I told him I give you like three a piece. [CS-1 stated that he had previously spoken to Larry about the specific amount that CS-1 owed Snowden and Larry, and that CS-1 believed the amount they had agreed on was $6,000 total, split evenly between Snowden and Larry ("three a piece")].[33]

SNOWDEN:         So now, so now, so, so, so now you playing with the, with order again.

CS-1:            No bro, it is what it is, shit. This my life we talking about bro.

SNOWDEN:         I'm trying to…

CS-1:            It's my life, it's my life man. I'm willing to do with it any and whatever it take man to make something happen.

SNOWDEN:         You messed that order up earlier. Right or wrong? [CS-1 failed to make the demanded $6,000 payment when CS-1 had CS-2 deliver the $1,900 to ██████].

CS-1:            Yeah.

SNOWDEN:         It's only one way to make it right so because this is how you make your, this is how you make your livelihood, this is how you make your livelihood you gonna make that right. That's the only way you can do that. I tried to, I tried to get my ten tacos but you messed that up and you gave me one and a half tacos, basically. [Snowden stated that CS-1 had

---

have used asterisks (*****) to denote points where portions of the draft transcripts have been redacted. Unintelligible portions of the recording are marked "UI".

[33] At various points in the Affidavit, I have included in brackets my understanding of certain words spoken in the recorded conversations. My understating of these words is based on the content and context of the recorded conversation, information provided by CS-1 and CS-2, my knowledge of the investigation as whole, and my training and experience.

to "make that right" by paying the rest of the money that CS-1 owed Snowden and Larry. Snowden stated he had tried to collect $10,000 dollars ("ten tacos") from CS-1 but CS-1 had delivered only around $1,500 ("one and a half tacos, basically").]

CS-1**:**                    Right.

******

SNOWDEN:            So that's the only way that you can make my order right.

CS-1:                    That shit gonna be tight as hell bro to be honest man. [CS-1 stated s/he was going to have a difficult time putting together the rest of the money that Snowden and Larry were demanding].

SNOWDEN:            I hear ya but you, you might be tight and I'm (UI).

CS-1:                    Hey look.

SNOWDEN:            But you messed my order up.

CS-1:                    I can get it as long as I get the, get my car back bro. I can go get it. I…

SNOWDEN:            As soon as my order for my tacos get in we good to go. You're five-star rating goes through… [Snowden stated that as soon as CS-1 pays the rest of the money, Snowden will take or cause the official action that CS-1 desires ("your five-star rating will go through")].

CS-1:                    Man, I don't think I can do, I can do like ten bro. That's all I got to my name man. I can give that to you tomorrow though.

SNOWDEN:            The quicker you give me my order the quicker you get your five-star rating.

CS-1:                    Well, can, can you work with me bro. Let me give you ten tomorrow man. That's all, that's all I got man.

31

SNOWDEN:            I tried to do that and you messed my order up.

CS-1:               There wasn't never no discussion bro but uh I appreciate
                    you trying but there was never no set price but I didn't
                    know. We had a misunderstanding [CS-1 stated that s/he
                    had had a misunderstanding with Snowden and Larry
                    about what money was owed when].

SNOWDEN:            You'll get a call tomorrow then.

CS-1:               Alright appreciate it bro.

**Recorded Call 2 (November 13, 2021, at approximately 1:02 p.m.)**

61.    During the second recording, which, based on the recording
timestamp/toll record comparison set out above, occurred on November 13, 2021, at
approximately 1:02 p.m., the following exchange occurred:

CS-1:               Yeah?

SNOWDEN:            You got that order? You working on that order? [Snowden
                    asked if CS-1 had or was working on putting together the
                    rest of the money that Snowden and Larry were demanding
                    from him/her].

CS-1:               Uh, yeah uh…the ten right?

SNOWDEN:            No, I told you what it went to because you messed that
                    order up. I told you what it went to.

CS-1:               I only had ten. That's what I was explaining to you
                    yesterday bro. You're gonna have to give me uh til next
                    week to get the other one. Right before, right before the
                    court date.

SNOWDEN:            When's that?

CS-1:               Shit that's what I was explaining to you yesterday. I could
                    of gave you half, half now and half right before the court
                    date.

32

SNOWDEN:        No, no, no, we're not doing that because how you messed the order up. When is your court date?

CS-1:           On the, on the first. So we got a whole month.

SNOWDEN:        Um um, I'm not waiting that…

CS-1:           And I'm on house arrest and I can't move nowhere bro. You know that.

SNOWDEN:        Listen, listen. You said you, you got ten tacos right now?

CS-1:           Yeah.

SNOWDEN:        I'm gonna tell ya what's gonna happen (UI).

CS-1:           Okay, hold on, hold on, hold on, hold on, let me, let me walk off right here.

SNOWDEN:        You said what?

CS-1:           Let me walk, let me walk to the back my kids right here.

                                ******

SNOWDEN:        You said you got ten tacos. You got ten tacos ready today?

CS-1:           Yeah, bro.

SNOWDEN:        You'll get a call back.

CS-1:           Hey look.

SNOWDEN:        Yep.

CS-1:           Hey, I'm telling you I need, I need that white piece of paper. That receipt 'cause uh to get the car out.

SNOWDEN:        As soon as. I told you you already know...when the order is taken care of you'll be taken care of.

                                *****

**Recorded Call 3 (November 13, 2021, at approximately 2:53 p.m.)**

62.     During the third recorded call, which, based on the recording timestamp/toll record analysis described above, occurred on November 13, 2021, at approximately 2:53 p.m., the following exchange occurred:

| | |
|---|---|
| SNOWDEN: | Order ready? |
| CS-1: | Yeah, what uh, yeah how we gonna do this? |
| SNOWDEN: | Alright, where you at now? |
| CS-1: | The same spot. [CS-1 told Snowden that s/he was at the same spot where CS-2 had made the initial payment to ▇▇▇ |
| SNOWDEN: | You got one, you got your, you got your man's with ya? [Snowden asked if CS-2 was with CS-1] |
| CS-1: | Uh, yeah. |
| SNOWDEN: | I wanted to meet, I wanted to meet, I wanted to meet this time. |
| CS-1: | You want, you want to meet with him? He say you scared him last time man. He say he ain't… |
| SNOWDEN: | No, listen, listen, when its done. All that everything else is done and you gonna get what you want. You making this hard for yourself. You ain't got, you ain't gotta be scared. I just let him know what it was to let you know. [Snowden stated that CS-1 and CS-2 did not have to be afraid so long as they paid Snowden and Larry. Snowden stated that he previously explained the consequences of not paying to CS-2 (which is corroborated by CS-2, see paragraph 43 above]. |
| CS-1: | Yeah but I ain't telling nobody, between me and you bro. All this what we had going on is between me and you. Me, you and Larry… |
| SNOWDEN: | No problem, no problem, okay… |

34

******

| | |
|---|---|
| SNOWDEN: | Yeah but the ten tacos still need to be delivered today. |
| CS-1: | Today, alright, bet. Uh, call me back. Call me back in about an hour, another hour and she should be here and everything should be in order. |
| SNOWDEN: | That's the last, that's the last hour I'm gonna give you. |
| CS-1: | Alright, appreciate it. |

### Recorded Call 4 (November 13, 2021, at approximately 5:21 p.m.)

63.    During the fourth recorded call, which, based on the recording timestamp/toll record analysis described above, occurred on November 13, 2021 at approximately 5:21 p.m., the following exchange occurred:

[call begins mid-conversation]

| | |
|---|---|
| CS-1: | Transaction probably 'til the morning bro. You think that's cool? |
| SNOWDEN: | I'm saying this and then I'm not gonna call you no more. |
| CS-1: | Any time in the morning. |
| SNOWDEN: | When I call you in the morning and it ain't done all bets are off and you gonna have to deal with every other thing, your car, everything is done. You ain't gonna be able to do nothing. Everything that, everything that I told ya, that was granted is done. |
| CS-1: | Okay. Hey what, hey you gonna have my slip. You gonna have my slip [the police document that CS-1 needed for his/her vehicle to be released from impoundment]. |
| SNOWDEN: | Everything will be done. |
| CS-1: | You gonna have that written up for me in the morning too? |

35

SNOWDEN:             Like I told you. I'll see what, how my order, how my taco
                     order doing in the morning.

CS-1:                By twelve o'clock.

SNOWDEN:             If my taco order ain't ready all bets are off, that's it.

CS-1:                By twelve bro. I got ya.

64.    On November 14, 2021, I met with CS-1 at his/her residence. During our meeting, I reviewed each of the above recordings. I then provided CS-1 with FBI recording equipment, instructed CS-1 on how to use the equipment, and directed CS-1 to use the FBI recording equipment for all future conversations with Snowden and Larry.[34]

65.    I further instructed CS-1 to arrange with Snowden and/or Larry to pay the additional money they asked and to try to split it up into at least two separate payments. Due to the short notice between when the FBI became involved in the investigation and the anticipated payment to Snowden and Larry on November 14, 2021, the CS-1 intended to make a partial payment to Snowden and Larry using CS-1's personal funds with the understanding that if the payment was made, CS-1 would be reimbursed by the FBI the following day; the FBI supplied the funds for the attempted payments starting on November 15, 2021.

---

[34] The equipment included an audio transmittal device that allowed law enforcement to listen in on CS-1 remotely and in real time. I explained the audio monitoring function to CS-1, and s/he voluntarily consented to such monitoring. I instructed CS-1 to always stay within range of the audio monitor, and s/he agreed to do so. I also instructed CS-1 to activate the speakerphone function on his phone if Snowden or Larry called, so that law enforcement could listen to the call in real time through the audio monitoring device.

66.     FBI agents did not maintain physical surveillance on CS-1's home because I determined that, given the layout of his neighborhood and the low level of traffic around CS-1's residence, there was a significant likelihood that surveillance would be detected by trained police officers such as Snowden and Larry. After departing CS-1's residence, law enforcement continuously monitored the audio feed from the device in CS-1's residence, and based on this monitoring, CS-1 appeared to generally comply with the instruction to remain within range of the audio transmittal device.

**Recorded Call Five (November 14, 2021, at approximately 2:15 p.m.)**

67.     Based on my monitoring of the audio device, as well as my later review of the recording and associated toll records, on November 14, 2021, at approximately 2:15 p.m., CS-1 Phone received an incoming call from Snowden using **Subject Phone 1** (Snowden). During the call, as summarized below, Snowden and CS-1 discussed how much money CS-1 had already paid to Snowden and Larry through CS-2, and when CS-1 would pay the outstanding demanded bribe money:

| | |
|---|---|
| CS-1 | What's up? |
| SNOWDEN | Order ready? |
| CS-1 | Yeah. |
| SNOWDEN | You sound, you sound unsure. |
| CS-1 | Yeah I got, yeah I got some. |
| SNOWDEN | No, not something is the order, is my full order of the ten tacos ready? |
| CS-1 | I got uh…75. [CS-1 stated s/he had $7,500 ready to give |

|  | Snowden]. |
|---|---|
| SNOWDEN | That's not what I asked. |
| CS-1 | Tomorrow, tomorrow. I, I can't get my car today. I can't get the car today so why can't this wait first thing in the morning and I can give you other piece and we get, I get my car and then the rest of it come later during the week. Come on working we black man. I'm on house arrest you know this bro. Come on man. I'm trying to fuck with you, man. |
| SNOWDEN | And I'm trying to fuck with you too 'cause apparently you need whatever's in that car. Right or wrong? |
| CS-1 | Yeah.[35] |
| SNOWDEN | So whatever's in that car you need it so… |
| CS-1 | Whatever the money you took off me I, I don't know. I had money, I had 2,700. I had mother fuckin'… [CS-1 is referring to the $2,700 that s/he stated s/he had in his/her vehicle at the time of his/her November 5, 2021 arrest]. |
| SNOWDEN | No, I didn't take no, no, no, I didn't do nothing like that now. I don't play like that. |
| CS-1 | Where the money, where all the cash go? |
| SNOWDEN | Brother, you talking about some 27? I don't know nothing about that. |
| CS-1 | Oh. |
| SNOWDEN | I don't have to hear bullshit about no, about no shit like that. |
| CS-1 | Oh man. |

---

[35] I asked CS-1 if s/he knew what SNOWDEN was referring to being inside CS-1's vehicle. CS-1 stated that s/he did not know. As explained below, on November 18, 2021, CS-2 retrieved CS-1's vehicle from impoundment. I surveilled CS-2 travel from the impoundment lot to CS-1's residence, where I and another agent immediately searched CS-2 and CS-1's vehicle for contraband or excessive cash, with negative results.

SNOWDEN                     If that was the case I wouldn't of even told you no shit like that. Like we wouldn't even be having the ten taco discussion. We didn't do no shit like that.

CS-1                        Alright, that, that's, it's probably still tuck then. I know I had some change in my car but it probably still in the envelope. Alright, I need, that's what I'm saying. I need my car bro.

SNOWDEN                     No.

CS-1                        I don't know what's going on. Shit.

SNOWDEN                     So, I'm gonna tell you like this tomorrow is Monday. You should expect a call around nine o'clock and that's gonna be the last time I'm calling for.

CS-1                        And you gonna, I'm gonna be able to go straight over there and get my shit man.

SNOWDEN                     When you, when you order the ten, when you deliver the ten tacos you can get your…you can get your (UI).

CS-1                        So you don't, you don't want, you don't want nothin' right now?

SNOWDEN                     Nope.

CS-1                        Alright, damn man.

SNOWDEN                     Nope, so at nine o'clock in the morning that's when…

CS-1                        So what happened to the 19 I gave you? [CS-1 is asking why Snowden was not factoring in to the total amount owed the $1,900 that CS-2 previously paid ███. That, that ain't gonna be the…what's you, what's you gonna add that up to. So I'm gonna have to owe you three right?

SNOWDEN                     It wasn't 19. It was, you know it wasn't so stop.

CS-1                        It was 19. How much it was?

SNOWDEN                     It was not 19.

| CS-1 | How much it was? |
|------|------------------|
| SNOWDEN | Bro, we not gonna play that game. It was not 19. Now, I'm, I'm hearing you out on what you gave then we can reduce it from what, from that but it wasn't 19 so don't even try to play me like that? |
| CS-1 | How much it was than bro. Tell me right now so I can know. |
| SNOWDEN | It was 15 [Snowden stated that CS-2 only gave ████ $1,500].[36] |
| CS-1 | Hell no. |
| SNOWDEN | That was 15. I'm not gonna sit here and bullshit you about some shit. It was 15. |
| CS-1 | Uh see this is a bunch of bullshit and then she said I didn't have no money in my pocket when I got arrested. |
| SNOWDEN | Bro you said, I had it in front of you. It was in front of, you signed off on it. What I'm gonna do that for? [Snowden stated that he had CS-1 sign a property inventory form that listed the money seized from CS-1 at the time of his/her arrest, so Snowden would not steal that money because there would be a record of it].[37] |
| CS-1 | So why you just can't add all that with it? |
| SNOWDEN | We will reduce the 15 from the 10. [Snowden and Larry will deduct the $1,500 from the $10,000, so CS-1 now had to pay them an additional $8,500]. |
| CS-1 | Alright. That was 19 but okay. |

---

[36] I have spoken to CS-1 and CS-2 about this issue. CS-1 insists that s/he gave $1900 to CS-2 to deliver. CS-2 stated that s/he did not count the money so does not know the total amount, and that s/he did not take any of the money before delivering it to ████. CS-2 also did not observe ████ count the money.

[37] According to CS-1, s/he does not recall ever signing any type of seized property inventory form.

| | |
|---|---|
| SNOWDEN | Which comes to what? |
| CS-1 | Huh? |
| SNOWDEN | Which comes to what? |
| CS-1 | Shit, bust they ass. |
| SNOWDEN | 85. |
| CS-1 | Alright. |
| SNOWDEN | That means you need to get another stack. |
| CS-1 | Alright. |
| SNOWDEN | I'll call you at 9 am but that, that's the last time I'm calling you. After that all bets are off. |
| CS-1 | Alright man. |

**Recorded Call Six (November 14, 2021, at approximately 2:22 p.m.)**

68. Based on my monitoring of the audio device, as well as my later review of the recording and associated toll records, minutes later, at approximately 2:22 p.m., CS-1 received a second incoming call from Snowden, who was using **Subject Phone 1**. During this recorded call, as outlined below, Snowden discussed CS-1's payment of the additional bribe demand:

| | |
|---|---|
| CS-1: | What up? |
| SNOWDEN: | Alright, you said you have the 75 [$7,500] right now, right? |
| CS-1: | Yeah, I'm uh…yep. |
| SNOWDEN: | Add five [$500] more to it and I will call it a quits and you go get your car, you go get your car first thing in the morning. Your cousin, your cousin can go get it. |
| CS-1: | Man, you trippin' now. You want me believe all this. |

41

SNOWDEN:            I'm telling you. He can go. Listen…

CS-1:               And my, and my case, and my case and you all, you all gonna throw that shit out, what you all put on all that shit that all added up on that mother fuckin' case. All that shit gonna be dropped, right? And I ain't gonna have to go to court.

SNOWDEN:            The only thing that you, that you only gotta deal with is the gun.

CS-1:               How?

SNOWDEN:            What you mean how? That was already told to you bro stop it.

CS-1                 Man…

SNOWDEN:            That's the only, all the drugs, the you trying to discard it, the, everything else the fighting, the everything else is done. I'm not even, we not gonna go seize it when we could and then once we do that and go in there and get what you looking for that's added to ya. [Snowden stated that, in exchange for the demanded payment, he planned to make sure that CS-1 was not charged with any drug offenses or for resisting arrest based on the November 5, 2021 traffic stop/arrest, but that CS-1 would still be charged with unlawfully possessing a firearm].

CS-1:               Man.

SNOWDEN:            That's four felonies, bro. At least but that's up to you.

CS-1:               So how we gonna do this.

SNOWDEN:            You was already told that you only had to deal with that one thing. [Snowden stated that someone (i.e. either Snowden or Larry) had previously told CS-1 that s/he would still be charged with the unlawful firearm possession offense despite the payments].

CS-1:               I didn't have to deal, you said all that shit was gonna come off me.

42

| | |
|---|---|
| SNOWDEN: | You said it was already told to you... |
| CS-1: | Officer Larry, you... |
| SNOWDEN: | You already was told that bro so we ain't even gonna play that game. We ain't even gonna play that. Now you said, you said you wanted stuff wiped down. That was taken care of but that was the only thing that you was told that what you gotta take care of. So stop. We ain't even gonna play this game. |
| CS-1: | I don't know, man this... |
| SNOWDEN: | That ain't even gonna be a game we play. |
| CS-1: | I can talk to Officer Larry man 'cause you trippin' man 'cause that ain't what we discussed. |
| SNOWDEN: | You can talk to him. I'll have, I'll have him [Larry] talk to you. |
| CS-1: | He gonna come, yeah let him come get uh... |
| SNOWDEN: | I'll have him call you. |
| CS-1: | ...'cause, alright. |

3.    Based on my discussions with CS-1, law enforcement's review of the audio monitor inside CS-1's residence, and my review of toll records, CS-1 had not had any contact with Snowden or Larry since the above phone call. I do not know why Snowden and Larry stopped communicating with CS-1 on November 14, 2021.

3.    *The Attempted CS-2 Recordings*

69.    On or about November 18, 2021, law enforcement directed CS-2 to go to the Phoenix police station and attempt to meet in person with Snowden and/or Larry to discuss the CS-1 payments and pick up the release paperwork for CS-1's vehicle.

Prior to the meeting, I met with CS-2 and equipped him/her with concealed recording equipment (which law enforcement was able to monitor remotely in real time). I and other agents then conducted physical surveillance on CS-2 while s/he traveled to the police station and attempted to meet with Snowden and Larry.

70. Based on physical surveillance, my review of the real-time audio feed and recordings, and a subsequent debriefing with CS-2 (during which CS-2 provided information that was consistent with what I had seen and observed over the audio feed),at approximately 10:20 a.m., CS-2 entered the Phoenix police station, approached a receptionist, and stated that s/he was there to pick up a tow release for CS-1. The receptionist responded in summary, by asking if CS-2 had come from the police officers and asked if CS-2 had paper from the police regarding the tow release; CS-2 stated that s/he did not and the receptionist stated that she would have to find out if she could provide the tow release paperwork; the receptionist left the desk for a period of time and then returned to confirm that the vehicle had insurance and CS-2 had a driver's license. While the receptionist was assisting CS-2, CS-2 asked if "Snowden or Bell" was working that day (CS-2 was under the mistaken belief that Larry's last name was Bell); the receptionist's response is not audible. The receptionist then directed CS-2 to go to a different window to make a payment and instructed CS-2 to bring the receipt back to her window. CS-2 then told the receptionist "[CS-1] said to tell Snowden that [s/he] got a taco dinner for him." The receptionist responded "(UI) oh tell him right now? Where is he going to meet [him/her] at?" CS-2 replied, "I don't know, [s/he] said to call [him/her], [s/he] got it for

him." The receptionist then asked if Snowden had CS-1's phone number and then asked why CS-1 didn't call Snowden; CS-2 responded "'Cause I guess [s/he] calls [him/her] I guess, I don't know." According to CS-2, minutes later Snowden appeared around the receptionist's desk and stared at CS-2 for several seconds but did not say anything.

71.     At approximately 11:05 a.m., CS-2 exited the police station and returned to my vehicle. I later examined the vehicle release paperwork that CS-2 had received from the Phoenix police department. The paperwork consisted of one document entitled "PHOENIX POLICE DEPARTMENT MOTOR VEHICLE IMPOUNDMENT AND INVENTORY. The form is dated November 5, 2021 at 9:53 a.m., which was the approximate time of CS-1's arrest. The vehicle operator is listed as CS-1, and the vehicle information matches CS-1's vehicle. The inventorying officer is listed as "Sgt. Snowden" and the inventorying officer's star number is listed as "17" which matches Snowden's star number from other documents associated with CS-1's arrest and prosecution. The document includes a handwritten note that states: "[CS-2] will be picking up vehicle for owner."

72.     After CS-2 obtained the vehicle release paperwork, I directed CS-2 to retrieve CS-1's car from impoundment. Later the same day, at approximately 1:50 p.m., I transported CS-2 to the private tow yard where CS-1's car was impounded. Before CS-2 entered the tow yard, I searched him/her for contraband or excessive amounts of cash, with negative results. I refitted CS-2 with the concealed recording equipment and s/he entered the private tow company. Based on my review of the

audio feed and subsequent debriefing with CS-2, while inside the tow company, CS-2 paid the impound fee and the vehicle was released.

73.     At approximately 2 p.m., I observed CS-2 leave the private tow company driving CS-1's vehicle. Nobody else appeared to be inside the vehicle. I followed CS-2 back to CS-1's residence. At the residence, I and another agent searched CS-2 and CS-1's vehicle for contraband or excessive amounts of cash, with negative results. I do not know who at the Phoenix police department ultimately authorized the release of CS-1's vehicle.

### 4. Hospital Records

74.     According to Ingalls Memorial Hospital medical records, on November 5, 2021, at approximately 10:25 a.m., CS-1 was admitted to Ingalls Memorial Hospital. The "Admit Type" is listed as "Emergency" and the "Admit Diag[nosis] Descr[iption] is listed as "Ingestion of Substance." A November 5, 2021 "ED [Emergency Department] Nursing Triage Note" states, "Pt [patient] presents to ED after ingesting cocaine, possibly 1 oz. EMS report pt was at traffic stop where he ingested the drugs, pt is in police custody. Robins officer Larry # 53 at bedside."[38] A November 6, 2021 Consultation Note states: "Patient . . . who presents in police

---

[38] I believe "Robins Officer" was a reference to the police officer at CS-1's bedside being employed by the Village of Robbins, Illinois, which is a village that is very close to Phoenix. I believe this was a mistake. IDES records reflect that Antoine Larry received wages from the Village of Phoenix in 2020 and 2021; there is no record of Larry receiving wages from the Village of Robbins during this period. Further, CS-1 has identified an unmarked photograph of Antoine Larry as the police officer who arrested CS-1 on November 5 (along with Snowden), accompanied CS-1 to the hospital, and later attempted to collect payments from CS-1 with Snowden. As explained throughout this affidavit, CS-1's identification of Antoine Larry is corroborated by substantial independent evidence, including toll records and information provided by CS-2 and CS-3.

custody after ingestion of several bags of cocaine, unclear how much he ingested because he was pulled over in a traffic stop when he took cocaine in an attempt to hide the bags . . ." The records further reflect that CS-1 was discharged from the hospital on November 7, 2021.

### 5. Cook County Court Documents

75.    According to Cook County Court documents, on November 8, 2021, CS-1 was charged by criminal complaint with aggravated unlawful use of a weapon (720 ILCS 5.0/24-1.6-A-1) and being an armed habitual criminal (720 ILCS 5.0/24-1.7). The complainant is listed as "State of Illinois/Phoenix Police Department." I am unable to make out the signature of the complainant, but the first letter of the first name appears to be a cursive "J", and the first letter of the last name appears to be a cursive "S", consistent with Jarrett Snowden. Further, the complainant lists his/her work telephone number as XXX-XXX-2193 (not **Subject Phone 1**, which I believe to be Snowden's personal phone). Other court records reflect that the charges arose from a traffic stop that occurred on November 5, 2021, at approximately 9:53 a.m. in the area of 151st Street and Halsted Street in the Phoenix/Harvey area.

76.    A "Cook County Livescan Correction Request Form", which lists the name of the arrestee and the arresting agency, was completed by a "Sgt. Snowden" of the Phoenix Police Department. "Sgt. Snowden's" star number is listed as "17", and his/her phone number is listed as the same 2193 number as the number of the

complainant in the felony complaint.[39]

77.     According to the docket sheet and Cook County bond paperwork, CS-1 was arraigned on the charges on November 8, 2021 and released on electronic home monitoring and a $50,000 bond secured by $5,000.[40]

### 6. Phoenix Police Department Records

78.     As part of this investigation, CS-1's defense counsel has provided the government with Phoenix police department records associated with CS-1's case that defense counsel has received in discovery from the Cook County State's Attorney. Because this investigation is still in a covert phase, I have not subpoenaed the Phoenix police department directly for records.

79.     Among the reports is a Phoenix Police Department Arrest Report. The arresting officer (who, based on my training and experience, is the report drafter), is listed as "Snowden, J", star number 17. The report reflects that on November 5, 2021, at approximately 9:53 a.m., Snowden conducted a traffic stop of CS-1 in the area of 151 North Halsted Street in Phoenix, which traffic stop led to CS-1's arrest. The report's narrative section states:

> IN SUMMARY ON DATE AND TIME REPORTING OFFICER SNOWDEN WAS PATROLLING THE VILLAGE OF PHOENIX WHEN NOTICING A WHITE CHRYSLER TRAVELING NORTHBOUND ON HALSTED ST DRIVING IN THE MIDDLE OF THE LANED ROADWAY AND BEARING NO FRONT LICENSE PLATE. SNOWDEN INITATED A TRAFFIC STOP ACTIVATED EMERGENCY LIGHTS AND SIRENS CURBING THE

[39] The "Livescan Correction Request Form" appears to amend the criminal complaint by adding a charge of armed habitual criminal, in violation of 720 ILCS 5/24-1.7(A).

[40] As of April 20, 2022, the charges remained pending against CS-1, and CS-1 remained on bond (electronic monitoring was withdrawn in January 2022). CS-1's next court appearance is scheduled for June 2, 2022.

VEHICLE AT HALSTED ST./WASHINGTON ST. THE DRIVER HAD A VALID DL AND INSURANCE. SNOWDEN DETECTED THE ODOR OF BURNT CANNABIS RESULTING IN HAVING THE DRIVER EXIT THE VEHICLE FOR A PROBABLE CAUSE SEARCH. DURING THE SEARCH SNOWDEN RECOVERED A LOADED WEAPON IN THE TRUNK OF THE VEHICLE. DRIVER DOES NOT HAVE A VALID FOID OR CONCEAL CARRY LICENSE. THE DRIVER THEN BEGAN TO FOAM FROM HIS MOUTH RESULTING IN BEING TRANSPORTED TO INGALLS HOSPITAL IN HARVEY, IL. ONCE DISCHARGED HE WAS TRANSPORTED AND PROCESSED ON CHARGES.

80. Notably, the above report does not mention Larry's presence/involvement in the traffic stop, the struggle that ensued between CS-1 and Larry and Snowden during the stop, CS-1's swallowing of crack cocaine, or the recovery of any crack cocaine (or other narcotics) or money in connection with the traffic stop and arrest. I have reviewed all other materials that CS-1's attorney has received in discovery (CS-1's attorney has confirmed that he provided us with a complete set of discovery materials), and none of these other materials indicate that any money was seized and/or inventoried as a result of CS-1's November 5, 2021 traffic stop and arrest.

81. One document included in the discovery materials indicated that a small amount of marijuana and drug paraphernalia was seized during CS-1's November 5, 2021 arrest. Specifically, an Illinois State Police (ISP) Drug Chemistry Laboratory Worksheet appears to list all the narcotics-related evidence associated with CS-1's arrest that the Phoenix police department turned over to the ISP for forensic

analysis.[41] The report lists: "[S]elf-sealed plastic evidence bag containing one black folding scale, one clear plastic bag containing plant material and one thing plastic bag labeled "Za Za Gabor" containing plant material." The report does not mention anything about cocaine (crack or powder). No other documents included in the discovery materials indicate that narcotics were seized or inventoried as a result of CS-1's November 5, 2021 arrest.

### 7. *Financial Records*

82.     On or about February 26, 2022, CS-1 provided law enforcement with a receipt from a pawn shop in Harvey, Illinois which appeared to reflect that on November 2, 2021, CS-1 received a $2,000 loan in exchange for providing a security interest in multiple valuables. According to CS-1, this $2,000 was included among the approximately $3,700 in cash s/he had on his/her person and within his/her vehicle at the time of his/her arrest. Based on CS-1's information, the corroborating evidence summarize above, and the lack of any documentation of money seized during the traffic stop and arrest, there is a reasonable basis to believe that Snowden and Larry stole the $3,700 that CS-1 had in is vehicle on November 5, 2021.

83.     CS-1 has also provided law enforcement with financial documents that, according to CS-1, relate to his/her efforts to gather approximately $2,000 to pay Larry on or about November 12, 2021. The records include Fifth Third Bank account records showing that CS-1 transferred $4,000 from a savings account into CS-1's

---

[41] Based on my training and experience, I know that many local police departments in Illinois use the Illinois State Police's drug laboratories to test the chemical make-up of suspected controlled substances.

checking account, followed by same day transfers to Cash App totaling $4,820.00. The Cash App records show that the funds transfers occurred on November 11, 2021, and the Fifth Third Bank records reflect the transactions occurring on November 12, 2021. Based on my training and experience, the discrepancy between the dates reflected in Cash App versus the dates reflected in the bank records is an indicator that the transactions were initiated on November 11, 2021, but that Fifth Third Bank did not complete clearing the transactions until November 12, 2021. Cash App transfer receipts showing that CS-1 transferred a total of $2,010 to two individuals on November 11, 2021.[42] CS-1 told law enforcement that these individuals were his girlfriend and the mother of his child. CS-1 further explained that each of these individuals withdrew the cash and brought it to him because he was under electronic home monitoring. CS-1 further explained that the $2,010 constituted all of the money he/she had at the time, and that s/he used approximately $110 to cover basic living expenses and used the other $1,900 to have CS-2 make the $1900 payment to ███ on November 12, 2021.

## IV. SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

84. Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy

---

[42] Based on my experience and information from public sources, Cash App is an online application that allows users to transfer money to one another using a mobile phone application.

information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.      Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b.      Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

85.     In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

86.     In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

87.     The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a.      I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.      If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.      If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.      In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered

54

to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.     As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Face ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using Face ID for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.      Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of SNOWDEN (**Subject Phone 1**), LARRY (**Subject Phone 2**), and ▮▮▮▮▮▮ (**Subject Phone 3**) to the fingerprint scanner of each individual's respective device; (2) hold the respective device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## V.    PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

88.     Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant will authorize the removal of electronic storage media and copying of electronically stored information found in the premises described in Attachment A so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

89.     The review of electronically stored information and electronic storage media removed from the premises described in Attachment A may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.      examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data

falls within the items to be seized as set forth in Attachment B;

        b.      searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

        c.      surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

        d.      opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

90.     The government will return any electronic storage media removed from the persons described in Attachments A1, C1, and E1 within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.

## VI.   FACTS SUPPORTING PROBABLE CAUSE TO SEARCH JARRETT SNOWDEN, ANTOINE LARRY, and ████████████

91.     Based on my training and experience, I know that it is customary for individuals who use cellular telephones to carry the devices on their person.

92.    In particular, based on the facts described above, there is probable cause to believe that Snowden, Larry, and ████ are carrying **Subject Phones 1**, **2**, and **3**, respectively, on their persons. Specifically, the facts indicate that Snowden, Larry, and ████ use their respective phones several times a day, including when they are away from their homes or offices. Further, as explained in detail above, as of at least November 2021, Snowden, Larry, and ████ were still using **Subject Phones 1**, **2**, and **3**, respectively. Subscriber records further show that, as of March 2022, ████ is still the registered subscriber of **Subject Phone 3** (I obtained the subscriber information for **Subject Phones 1** and **2** in November 2021 and not sought updated subscriber information since that time).

93.    Based upon my training and experience, I know that cellular phones used by those engaged in criminal activity often contain evidence of criminal activity, including call history, contact lists, calendar entries, emails, and text messages made or received that are located in the memory, which messages may provide information regarding the identities of, and the methods and means of operation and communication used by, the participants of criminal activity. Moreover, digital photographs located in the memory of phones may contain images of the tools of and participants involved in criminal activity, images of the user of the phones, the users' associates (including persons involved in or knowledgeable about the Subject Offenses), places frequented by the user of the phone leading up to and during the criminal activity, and locations and instrumentalities used in committing the criminal activity.

94.     In addition, based on my training and experience, I know that information stored within a cellular phone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored within a cell phone can indicate who has used or controlled the cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time. Further, such stored electronic data can show how and when the cell phone and its related account were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cell phone access, use, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner.

95.     Additionally, information stored within a cell phone may indicate the geographic location of the cell phone and user at a particular time (*e.g.*, location integrated into an image or video sent via email or text message, to include both metadata and the physical location displayed in an image or video). Stored electronic data may also provide relevant insight into the cell phone owner's state of mind as it relates to the offense under investigation. For example, information in the cell phone may indicate the owner's motive and intent to commit a crime (*e.g.*, communications

relating to the crime) or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement). Unless this data is destroyed, by breaking the cell phone itself or by a program that deletes or over-writes the data contained within the cell phone, such data will remain stored within the cell phone indefinitely.

96.    Individuals involved in criminal offenses also often store telephone numbers and names or nicknames of fellow conspirators on their telephones, and the telephones also reflect recent call history. Further, individuals often use text messaging and digital photographs in furtherance of their criminal activity that are stored on cellular telephones. Because, as explained above, the **Subject Phones** are associated with the targets in this case, because there was telephonic communication between participants involved in the **Subject Offenses**, and because, in my experience and in the experience of other agents, those engaged in criminal conduct use phones to contact co-conspirators, there is probable cause to believe the **Subject Phones** contain evidence of the **Subject Offenses**.

97.    Therefore, the warrant in support of which this affidavit is submitted also seeks authorization to search the persons of Snowden, Larry, and ███ for purposes of seizing **Subject Phones 1**, **2**, and **3**, respectively

## VII.  Conclusion

98.    Based on the above, I respectfully submit that there is probable cause to believe: (1) beginning on or about November 5, 2021, and continuing until on or about November 14, 2021, Jarrett Snowden, Antoine Larry, and ███████████ conspired

to commit extortion, which extortion would have obstructed, delayed, and affected commerce, namely, by obtaining property from CS-1, with his consent, under color of official right and induced by wrongful use of fear, in violation of 18 U.S.C. § 1951(a)[43]; (2) on or about November 12, 2021, Snowden, Larry, and ███████ committed extortion, which extortion obstructed, delayed, and affected interstate commerce, namely, by obtaining an at least $1,500 cash payment from CS-1, with his/her consent, under color of official right and induced by wrongful use of fear, in violation of 18 U.S.C. § 1951(a); (3) beginning on or about November 5, 2021, and continuing until on or about November 14, 2021, Snowden and Larry, both agents of the Village of Phoenix, a unit of local government that received $10,000 or more in federal funding on December 6, 2021 conspired to corruptly solicit and demand, and accept and agree to accept, a thing of value, namely cash payments of over $5,000, for the benefit of Snowden and Larry, intending for Snowden and Larry to be influenced in connection with business, transaction, and series of transactions of the Village of Phoenix involving a thing of value of $5,000 or more, namely, preventing certain criminal charges from being filed, or causing certain criminal charges to be dropped, against CS-1, and causing CS-1's vehicle to be released from Village of Phoenix police impoundment, in violation of 18

---

[43] Since CS-1 is a drug dealer, the alleged extortion scheme sufficiently impacted interstate commerce to constitute a violation of the Hobbs Act (18 U.S.C. § 1951(a)). As the Supreme Court has explained, the "production, possession, and distribution of controlled substances constitutes a class of activities that in the aggregate substantially affect interstate commerce." *United States v. Taylor*, 136 S. Ct. 2074, 2080 (2016). Thus, the extortion of a drug dealer impacts interstate commerce under a "depletion of assets" theory—finances that would have otherwise been used in furtherance of the interstate drug trade are diverted to payments associated with the extortion. *See, e.g., United States v. Bailey*, 227 F.3d 792, 797-98 (7th Cir. 2000); *United States v. Moore*, 363 F.3d 631, 636 (7th Cir. 2004).

U.S.C. § 666(a)(1)(B), in violation of 18 U.S.C. § 371; and (4) beginning on or about November 5, 2021, and continuing until on or about November 14, 2021, Snowden and Larry, both agents of the Village of Phoenix, a unit of local government that received $10,000 or more in federal funding on December 6, 2021 corruptly solicited and demanded, and accepted and agreed to accept, a thing of value, namely cash payments of over $5,000, for the benefit of Snowden and Larry, intending for Snowden and Larry to be influenced in connection with business, transaction, and series of transactions of the Village of Phoenix involving a thing of value of $5,000 or more, namely, preventing certain criminal charges from being filed, or causing certain criminal charges to be dropped, against CS-1, and causing CS-1's vehicle to be released from Village of Phoenix police impoundment, in violation of 18 U.S.C. § 666(a)(1)(B).

99.     I further submit that there is probable cause to believe that evidence of the **Subject Offenses**, namely the items described in Attachments B2, D2, and F2, are now located within **Subject Phones 1**, **2**, and **3**, that these phones were used in committing the **Subject Offenses**, and that these phones are carried on the persons of Jarrett Snowden, Antoine Larry, and ███████████, respectively. I therefore respectfully request that this Court issue search warrants for: (1) the search of Snowden's person (as more particularly described in Attachment A1) for purposes of locating and seizing **Subject Phone 1** (as more particularly described in Attachments A2 and B1); (2) **Subject Phone 1**, authorizing the seizure of items described in Attachment B2, pursuant to the protocol described in the addendum to

Attachment B2; (3) the search of Larry's person (as more particularly described in Attachment C1) for purposes of locating and seizing **Subject Phone 2** (as more particularly described in Attachments C2 and D1); (4) **Subject Phone 2**, authorizing the seizure of items described in Attachment D2, pursuant to the protocol described in the addendum to Attachment D2; (5) the search of ████ person (as more particularly described in attachment E1), for purposes of locating and seizing **Subject Phone 3**, (as more particularly described in Attachments E2 and F1); and (6) **Subject Phone 3**, authorizing the seizure of items described in Attachment F2, pursuant to the protocol described in the addendum to Attachment F2.

FURTHER AFFIANT SAYETH NOT.

s/ Jody Blau (with permission BWJ)

JODY BLAU
Special Agent, Federal Bureau of Investigation

SWORN TO AND AFFIRMED by telephone 26th day of April, 2022

Honorable BETH W. JANTZ
United States Magistrate Judge

64

AO 93 (Rev. 11/13) Search and Seizure Warrant                                    AUSA Alexandra Morgan, ███████

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

### __UNDER SEAL__

In the Matter of the Search of:                   Case No.   22 M 323
The person of Jarrett Snowden, as described in
Attachment A1

## SEARCH AND SEIZURE WARRANT

To: Jody Blau and any authorized law enforcement officer

   An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Northern District of Illinois:

### See Attachments A1

   I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

### See Attachments B1

   **YOU ARE HEREBY COMMANDED** to execute this warrant on or before May 10, 2022 in the daytime (6:00 a.m. to 10:00 p.m.).

   Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

   The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the issuing United States Magistrate Judge.

Date and time issued: April 26, 2022 at 2:18 p.m.          _____
                                                                    *Judge's signature*

City and State: Chicago, Illinois                          BETH W. JANTZ, U.S. Magistrate Judge
                                                                    *Printed name and title*

## **ATTACHMENT A1**

## **DESCRIPTION OF PERSON TO BE SEARCHED**

Jarrett Snowden, who appears to be approximately 6'1" in height and 175 pounds in weight, as further described in the photograph below, but limited to the search and seizure of the cellular telephone further described in Attachment B1 below.



## ATTACHMENT B1

## LIST OF ITEMS TO BE SEIZED

Instrumentality involved in violations of Title 18, United States Code, Sections 371, 666(a)(1)(B) and 1951(a) as follows:

- Samsung Galaxy Note 9, assigned IMEI number 358959099339769 and assigned telephone number (708) 527-5320 (the "**Subject Phone 1**").

AO 93 (Rev. 11/13) Search and Seizure Warrant                           AUSA Alexandra Morgan, ███████

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

### <u>UNDER SEAL</u>

In the Matter of the Search of:                    Case No.  22 M 324
The cellular telephone, further described in
Attachment A2 ("**Subject Phone 1**")

## SEARCH AND SEIZURE WARRANT

To: Jody Blau and any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Northern District of Illinois:

### See Attachments A2

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

### See Attachments B2

**YOU ARE HEREBY COMMANDED** to execute this warrant on or before <u>May 10, 2022</u> in the daytime (6:00 a.m. to 10:00 p.m.).

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the issuing United States Magistrate Judge.

Date and time issued: <u>April 26, 2022 at 2:18 p.m.</u>           _____
                                           *Judge's signature*

City and State: <u>Chicago, Illinois</u>                  <u>BETH W. JANTZ, U.S. Magistrate Judge</u>
                                        *Printed name and title*

**ATTACHMENT A2**

**LIST OF ITEMS TO BE SEARCHED**

Instrumentality involved in violations of Title 18, United States Code, Sections 371, 666(a)(1)(B) and 1951(a) as follows:

    a.    Samsung Galaxy Note 9, assigned IMEI number 358959099339769 telephone number (708) 527-5320 (the "**Subject Phone 1**").

## Attachment B2

## LIST OF ITEMS TO BE SEIZED

Evidence of violations of Title 18, United States Code, Sections 371, 666(a)(1)(B) and 1951(a) as follows:

- Items related to Antoine Larry, ███████████, CS-1, CS-2, and/or CS-3.

- Items related to the theft of property in the custody of the Phoenix police department.

- Items related to personal payments or other things of value sought from others in connection with Snowden's and Larry's official duties.

- Items related to official action promised, caused, or taken by Snowden and Larry or other officers in exchange for or in connection with things of value.

Law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of Snowden to the fingerprint scanner of **Subject Phone 1**; (2) hold **Subject Phone 1** in front of the face of Snowden and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

4

AO 93 (Rev. 11/13) Search and Seizure Warrant                                              AUSA Alexandra Morgan, ███████

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

## <u>UNDER SEAL</u>

In the Matter of the Search of:                    Case No.  22 M 322
The person of Antoine Larry, further
Described in Attachment C1

## SEARCH AND SEIZURE WARRANT

To: Jody Blau and any authorized law enforcement officer

      An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Northern District of Illinois:

### See Attachments C1

      I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

### See Attachments D1

      **YOU ARE HEREBY COMMANDED** to execute this warrant on or before <u>May 10, 2022</u> in the daytime (6:00 a.m. to 10:00 p.m.).

      Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

      The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the issuing United States Magistrate Judge.

Date and time issued: <u>April 26, 2022 at 2:18 p.m.</u>         _____
                                            *Judge's signature*

City and State: <u>Chicago, Illinois</u>                  BETH W. JANTZ, U.S. Magistrate Judge
                                                *Printed name and title*

## ATTACHMENT C1

## DESCRIPTION OF PERSON TO BE SEARCHED

Antoine Larry, who appears to be approximately 5'8" in height and 198 pounds in weight, as further described in the photograph below, but limited to the search and seizure of the cellular telephone further described in Attachment D1 below.



## ATTACHMENT D1

## LIST OF ITEMS TO BE SEIZED

Instrumentality involved in violations of Title 18, United States Code, Sections 371, 666(a)(1)(B) and 1951(a) as follows:

- Samsung Galaxy S8, assigned IMEI number 354023081560751 and assigned telephone number (708) 552-7682 (the "**Subject Phone 2**").

AO 93 (Rev. 11/13) Search and Seizure Warrant                                    AUSA Alexandra Morgan, ▌▌▌▌▌

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

### UNDER SEAL

In the Matter of the Search of:                          Case No.  22 M 325
The cellular telephone, further
described in Attachment C2 ("**Subject Phone 2**")

### SEARCH AND SEIZURE WARRANT

To: Jody Blau and any authorized law enforcement officer

      An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Northern District of Illinois:

### See Attachments C2

      I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

### See Attachments D2

      **YOU ARE HEREBY COMMANDED** to execute this warrant on or before May 10, 2022 in the daytime (6:00 a.m. to 10:00 p.m.).

      Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

      The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the issuing United States Magistrate Judge.

Date and time issued: <u>April 26, 2022 at 2:18 p.m.</u>                                             
_Judge's signature_

City and State: <u>Chicago, Illinois</u>                              BETH W. JANTZ, U.S. Magistrate Judge
_Printed name and title_

## ATTACHMENT C2

### LIST OF ITEMS TO BE SEARCHED

Instrumentality involved in violations of Title 18, United States Code, Sections 371, 666(a)(1)(B) and 1951(a) as follows:

- Samsung Galaxy S8, assigned IMEI number 354023081560751 telephone number (708) 552-7682 (the "**Subject Phone 2**").

**<u>Attachment D2</u>**

**LIST OF ITEMS TO BE SEIZED**

Evidence of violations of Title 18, United States Code, Sections 371, 666(a)(1)(B) and 1951(a) as follows:

- Items related to Jarrett Snowden, ███████████, CS-1, CS-2, and/or CS-3.

- Items related to the theft of property in the custody of the Phoenix police department.

- Items related to personal payments or other things of value sought from others in connection with Snowden's and Larry's official duties.

- Items related to official action promised, caused, or taken by Snowden and Larry or other officers in exchange for or in connection with things of value.

Law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of Larry to the fingerprint scanner of **Subject Phone 2**; (2) hold **Subject Phone 2** in front of the face of Larry and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

4

AO 93  (Rev. 11/13) Search and Seizure Warrant                    AUSA Alexandra Morgan, ████████████

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

### <u>UNDER SEAL</u>

In the Matter of the Search of:                    Case No.  22 M 321
The person of ████████████ , further
described in Attachment E1

## SEARCH AND SEIZURE WARRANT

To: Jody Blau and any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Northern District of Illinois:

### See Attachments E1

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

### See Attachments F1

**YOU ARE HEREBY COMMANDED** to execute this warrant on or before <u>May 10, 2022</u> in the daytime (6:00 a.m. to 10:00 p.m.).

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the issuing United States Magistrate Judge.

Date and time issued: <u>April 26, 2022 at 2:18 p.m.</u>

_____
*Judge's signature*

City and State: <u>Chicago, Illinois</u>

<u>BETH W. JANTZ, U.S. Magistrate Judge</u>
*Printed name and title*

**<u>ATTACHMENT E1</u>**

**DESCRIPTION OF PERSON TO BE SEARCHED**

███████████ who appears to be approximately ███ in height and ███ pounds in weight, as further described in the photograph below, but limited to the search and seizure of the cellular telephone further described in Attachment F1 below.



**ATTACHMENT F1**

**LIST OF ITEMS TO BE SEIZED**

Instrumentality involved in violations of Title 18, United States Code, Sections 371, 666(a)(1)(B) and 1951(a) as follows:

- iPhone 11 Pro Max A2161 assigned ESN/MSN number 352849115604732 and assigned telephone number (708) 574-6862 (the "**Subject Phone 3**").

AO 93 (Rev. 11/13) Search and Seizure Warrant                                    AUSA Alexandra Morgan, ▮▮▮▮▮▮

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

### **UNDER SEAL**

In the Matter of the Search of:                    Case No.  22 M 326
The cellular telephone, further
described in Attachment E2 ("**Subject Phone 3**")

## SEARCH AND SEIZURE WARRANT

To: Jody Blau and any authorized law enforcement officer

      An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Northern District of Illinois:

### See Attachments E2

      I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

### See Attachments F2

      **YOU ARE HEREBY COMMANDED** to execute this warrant on or before <u>May 10, 2022</u> in the daytime (6:00 a.m. to 10:00 p.m.).

      Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

      The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the issuing United States Magistrate Judge.

Date and time issued: <u>April 26, 2022 at 2:18 p.m.</u>       _____
                                                      *Judge's signature*

City and State: <u>Chicago, Illinois</u>                     BETH W. JANTZ, U.S. Magistrate Judge
                                                *Printed name and title*

## ATTACHMENT E2

## LIST OF ITEMS TO BE SEARCHED

Instrumentality involved in violations of Title 18, United States Code, Sections 371, 666(a)(1)(B) and 1951(a) as follows:

- iPhone 11 Pro Max A2161 assigned ESN/MSN number 352849115604732 and assigned telephone number (708) 574-6862 (the "**Subject Phone 3**").

**Attachment F2**

**LIST OF ITEMS TO BE SEIZED**

Evidence of violations of Title 18, United States Code, Sections 371, 666(a)(1)(B) and 1951(a) as follows:

- Items related to Jarrett Snowden, Antoine Larry, CS-1, CS-2, and/or CS-3.
- Items related to the theft of property in the custody of the Phoenix police department.
- Items related to personal payments or other things of value sought from others in connection with Snowden's and Larry's official duties.

Law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of ▮▮▮▮ to the fingerprint scanner of **Subject Phone 3**; (2) hold **Subject Phone 3** in front of the face of ▮▮▮▮ and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

8

## ADDENDUM TO ATTACHMENTS B2, D2, and F2

Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant authorizes the removal of electronic storage media and copying of electronically stored information, namely, **Subject Phones 1**, **2**, and **3** so that they may be reviewed in a secure environment for information consistent with the warrant.

Subject to the exceptions to the warrant requirement as recognized by law, the government may search only those electronic storage media that fall within the criteria as described in Attachments B2, D2, and F2.

The government's review of removed electronic storage media shall be conducted pursuant to the following protocol:

The government must make reasonable efforts to use methods and procedures that will locate those categories of data, files, documents, or other electronically stored information that are identified in the warrant, while minimizing exposure or examination of categories that will not reveal the items to be seized in Attachments B2, D2, and F2.

The review of electronically stored information and electronic storage media removed from the persons described in Attachments A1, C1, and E1 may include the below techniques. These techniques are a non-exclusive list, and the government may use other procedures if those procedures are designed to minimize the review of information not within the list of items to be seized as set forth in Attachments B2, D2, and F2:

a. examination of categories of data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachments B2, D2, and F2;

b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachments B2, D2, and F2;

c. surveying various file directories and folders to determine whether they include data falling within the list of items to be seized as set forth in Attachments B2, D2, and F2;

d. opening or reading portions of files, and performing key word or concept searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachments B2, D2, and F2; and

e. using forensic tools to locate data falling within the list of items to be seized as set forth in Attachments B2, D2, and F2.

Law enforcement personnel are not authorized to conduct additional searches for any information beyond the scope of the items to be seized by this warrant as set forth in Attachments B2, D2, and F2. To the extent that evidence of crimes not within the scope of this warrant appears in plain view during the government's review, the government shall submit a new search warrant application seeking authority to expand the scope of the search prior to searching portions of that data or other item that is not within the scope of the warrant. However, the government may continue its search of that same data or other item if it also contains evidence of crimes within the scope of this warrant.

The government will return any electronic storage media removed from the persons described in Attachments A1, C1, and E1 within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.

2